NOT DESIGNATED FOR PUBLICATION

Nos. 128,657
128,658
128,659

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of A.C.B., A.M.S., and C.M.S.,
Minor Children.

MEMORANDUM OPINION

Appeal from Sumner District Court; CANDACE R. LATTIN, magistrate judge. Submitted without oral argument. Opinion filed February 13, 2026. Reversed and remanded with directions.

*Chay Howard*, of Greensburg, for appellant natural mother.

*Erin L. Zoglmann*, deputy county attorney, for appellee.

*Matthew B. Metcalf*, guardian ad litem, of Wellington.

Before ISHERWOOD, P.J., CLINE, J., and COURTNEY D. CRAVER, District Judge, assigned.

PER CURIAM: C.S. (Mother) appeals the termination of her parental rights. She argues that the district court violated her due process rights by allowing the termination hearing to proceed on a motion to terminate that was filed more than two years before the hearing and by allowing the State to present evidence beyond the facts alleged in the motion. We agree. A parent has both a statutory and a constitutional right to notice of the specific basis upon which the State seeks termination of parental rights. That standard was not met in this case. Therefore, we reverse the district court and remand this case for further proceedings.

1

## FACTUAL AND PROCEDURAL BACKGROUND

Mother has three children—A.C.B., A.M.S., and C.M.S. In January 2020, police interviewed Mother and M.S. (Father), the biological father of C.M.S. and stepfather to the other two children, regarding a stolen vehicle. While the family was at the police department, law enforcement officers interviewed Mother's sister who disclosed that Mother had been using drugs, the children were not attending school regularly, and Mother and Father were served with a 30-day eviction notice. As a result, the children were placed in protective custody. The State filed petitions alleging the children were in need of care shortly thereafter. The district court granted temporary custody of the children to the State. Mother submitted no contest statements as to the allegations in the petition.

More than four years and nine months passed before the district court terminated Mother's parental rights. During that time, Mother alternated between periods of progress and relapse.

For most of 2020, Mother made positive strides in her case plan tasks by actively engaging in drug treatment, securing employment and housing, and maintaining contact with her children. She submitted a positive test result for methamphetamine on one occasion in October 2020, shortly after Father was bailed out of jail, but resumed her path forward once he was taken back into custody.

By January 2021, Mother had progressed to five days of unsupervised visits with her children and by March of that year they were reintegrated into the home with Mother full time. They were briefly removed from her care approximately two months later following her positive test for methamphetamine, but they were reunited by the end of that month.

Father reentered the home in July 2021 following his release from prison. The next month, Mother received a three-day jail sanction after testing positive for methamphetamine again. Case workers developed a new safety plan with Mother, which included provisions that she was not to care for the children while under the influence and Father was not to reside in the home. Things failed to improve and the children were removed from the home in September 2021 after hair follicle testing revealed their environmental exposure to methamphetamine. Mother and Father also tested positive for methamphetamine which resulted in a six-month jail term for Mother as a result of violating the terms of her probation. For Mother, 2021 ended with a permanency hearing at which the district court found that reintegration was no longer a viable goal and ordered the State to file a motion to terminate parental rights.

Mother continued working her case plan in 2022. She completed her jail sentence in late February 2022, spent most of March in inpatient treatment, and moved into an Oxford House at the end of that month. She resumed visitation with the children, via Zoom, while in treatment but transitioned to in-person upon her release from the facility. Mother moved to another Oxford House in late April 2022, requested a protection order against Father, and found a job. The State filed motions to terminate Mother's parental rights in April and May 2022 but withdrew them within three weeks of filing in light of Mother's progress with her case plan tasks.

Mother's visits with the children progressed from monitored in May 2022 to unsupervised in June 2022. During the latter month, however, Mother reported to case workers that she suffered a domestic violence incident with Father during which he hit her several times before abandoning her in the country with no way to return home. A fellow Oxford House resident picked her up and upon her return, the house members conducted an emergency meeting about the incident. During the meeting, a resident spotted a man matching Father's physical profile peeping in the windows. The police were notified and the household voted to evict Mother to keep themselves and their own

children safe in the Oxford House. Mother did not go to work for the next two days and lost her job as a result.

Because of alleged recurring domestic violence, coupled with the length of time the children had been in custody, Mother's case team filed a court report recommending a finding that reintegration was no longer a viable goal. In late June 2022, the district court adopted the case team's recommendation and ordered the State to file a motion to terminate Mother's parental rights.

The record reveals little of what transpired over the next nine months. In March 2023, the State filed motions to terminate Mother's parental rights as to each child yet the most recent factual allegations in the motion were from June 2022, except for an attachment that contained a short update through July 2022. A termination hearing was scheduled for October 2023 to address the following statutory factors the State relied on as support for its claim that Mother was unfit:

- K.S.A. 38-2269(b)(7): Failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family;
- K.S.A. 38-2269(b)(8): Lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the child's needs;
- K.S.A. 38-2269(b)(9): The child has been in extended out of home placement as a result of actions or inactions attributable to the parent;
- K.S.A. 38-2269(c)(2): Failure to maintain regular visitation, contact, or communication with the child or with the custodian of the child; and
- K.S.A. 38-2269(c)(3): The parent has failed to carry out a reasonable plan to reintegrate the children.

Meanwhile, Mother attended inpatient drug treatment in California in June 2023. She completed the program and resumed Zoom visits with the children in September

2023, while residing in a sober living facility in California. The October termination hearing was continued and Mother returned to Kansas in December 2023, at which time she established a residence with an Oxford House and found a job. In mid-January 2024, Mother received notice that the district court scheduled a hearing for the end of the month to ascertain whether termination of her parental rights was warranted.

The week before the termination hearing, Mother filed a relinquishment of her parental rights to all three children. The natural fathers of A.C.B. and A.M.S. had never participated in the case, so the district court only addressed Father's rights during the January 31 hearing. It concluded he was unfit and terminated his parental rights to C.M.S.

Nine days later, Mother moved to set aside her relinquishment, asserting that it was not knowing, free, and voluntary. Mother's attorney withdrew, and the district court appointed new counsel. In July 2024, the district court set aside Mother's relinquishment and scheduled a hearing for termination of her parental rights.

Mother's termination hearing finally occurred in September 2024. At the outset, she objected to the proceeding going forward given that approximately 18 months had passed since the State filed its termination motion and no aspect of the factual foundation it offered in support of its termination request occurred after July 2022. She argued that proceeding with the hearing violated the requirement under K.S.A. 38-2267(a) to conduct a hearing within 90 days from the filing of the State's motion, unless the district court found that it was in the best interests of the child to allow a continuance. Mother argued it was incumbent upon the State to file an updated termination motion, based upon more contemporaneous factual allegations, which the district court should then hear within 90 days.

While the court acknowledged the "extremely long period of time" that had passed since the State filed its motion, it allowed the hearing to go forward over Mother's

5

objection. It also declined to limit the State's evidence, provided the State's allegations were linked to one of the statutory bases for termination outlined in its motion. The court reasoned those bases were sufficient to provide Mother with the requisite notice for the evidence the State intended to offer at the hearing.

Both Mother and her case manager, Miki Stearns, testified. Mother's attorney objected when Stearns was asked for the current status of Mother's progress on case plan tasks as it was outside the temporal scope of the State's motion, but the objection was overruled. Stearns briefly testified that Mother secured housing, as well as employment, and completed a parenting class as directed. She also opined that Mother needed to work on consistency, particularly with respect to her attendance for random drug testing, as well as for her substance use and mental health treatment. Stearns acknowledged that Mother stayed in "fairly consistent contact" with her case team.

Stearns chronicled the progress of the case from the filing of the motion in March 2023 to the time of the termination hearing in September 2024. Stearns explained that the case team ceased its involvement with Mother's plan after she relinquished her rights in January 2024, but that Mother resumed her efforts after persuading the district court to set aside the relinquishment. Stearns made little mention of Father and the way his relationship with Mother impacted the case.

The district court found by clear and convincing evidence that Mother was unfit by reason of conduct or condition which rendered her unable to care for her children and that the conduct or condition was unlikely to change in the foreseeable future. It cited a single statutory factor for its ruling—K.S.A. 38-2269(b)(8)—"lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child," and referenced what it described as a pattern of success and failure that permeated the case. The district court observed that Mother did well at the outset but relapsed in the fall of 2021, which stymied her progress. She began anew and

6

successfully worked through her case plan until the domestic violence incident with Father in June 2022, which again halted her progress, albeit only temporarily. The district court found it notable that despite Mother's troubled history with Father, the two completed inpatient treatment together in California, and he was back in Kansas. It observed that Mother's continued contact with Father was a barrier to her continued sobriety. The district court ultimately concluded that it was in the children's best interests that Mother's rights be terminated.

The district court addressed the other four statutory bases alleged by the State and outlined the reasons it declined to base its unfitness finding on those factors. It explained that while the family was not presently reintegrated, reasonable efforts by the State successfully reintegrated the family at other times during the case. It also observed that the State neglected to prove that Mother failed to maintain regular contact with the children, or that the children were in extended out of home placement because of Mother. Rather, Mother did a good job communicating with the children and remained in contact with them throughout the case. Finally, the district court found that Mother exerted effort to carry out her case plan tasks even though it was frequently a process of fits and starts.

Mother timely appealed.

LEGAL ANALYSIS

Mother argues that her procedural due process rights were violated when the district court conducted a hearing on the State's termination motion well beyond 90 days after that motion was filed, in contravention of K.S.A. 38-2267(a). She contends that the district court erred when it declined to require the State to file an updated motion and compounded its error by allowing the State to admit evidence that went beyond the facts and temporal period alleged in its motion.

7

*Standard of Review and Legal Principles*

The question of whether a person's due process rights were violated is a question of law over which appellate courts exercise unlimited review. *In re A.S.*, 319 Kan. 396, 399, 555 P.3d 732 (2024). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *In re J.D.C.*, 284 Kan. 155, 166, 159 P.3d 974 (2007). To establish a due process violation, a person must establish that he or she was entitled to and denied a specific procedural protection. See 284 Kan. at 166. We employ a balancing test in determining the nature of a procedural protection that must accompany the deprivation of a person's liberty interest. This test requires consideration of three factors:

> "(1) the individual interest at stake; (2) the risk of erroneous deprivation of the interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (3) the State's interest in the procedures used, including the fiscal and administrative burdens that any additional or substitute procedures would entail." 284 Kan. at 166-67 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 [1976]).

*The Individual Interest at Stake*

The first point involves a parent's right to make decisions regarding the care, custody, and control of his or her child. This interest has been recognized as a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution. *In re J.D.C.*, 284 Kan. at 166. It is "perhaps the oldest of the fundamental liberty interests recognized" by the United States Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). And, "other than the right to personal freedom, there may be no private right valued more highly or protected more zealously by the courts than the right of a parent to the custody and control of his or her children." *In re J.L.*, 20 Kan. App. 2d 665, 671, 891 P.2d 1125 (1995). Consequently, it is

"entitled to the highest protection from unwarranted governmental action." 20 Kan. App. 2d at 671; see also *In re A.S.*, 319 Kan. at 403 ("[I]mportant, consequential, fundamental rights are afforded greater due process protections than less important ones."). This is especially true where, as here, the State seeks to wholly terminate a parent's right instead of merely infringing on it. This creates "a unique kind of deprivation." *Lassiter v. Department of Social Services of Durham County, N.C.*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981). Accordingly, "[a] parent's interest in the accuracy and justice of the decision to terminate his or her parental status is . . . a commanding one." 452 U.S. at 27. For these reasons, this factor weighs in Mother's favor.

*The Risk of Erroneous Deprivation of the Interest Through the Procedures Used and the Probable Value, If Any, of Additional or Substitute Procedural Safeguards*

Mother's argument on the second step of the inquiry goes to notice, an essential element of due process. *In re B.H.*, 64 Kan. App. 2d 480, 482, 550 P.3d 1274 (2024). She highlights that the most recent factual allegations set forth in the State's motion to terminate were more than two years old by the time the hearing was conducted in September 2024. It is Mother's position that the State's failure to identify recent, pointed factual allegations to meet its burden required her to guess as to what to expect to specifically defend against on the date of the hearing. This was particularly problematic, she contends, for contesting the State's allegation that her unfitness was unlikely to change for the foreseeable future.

Two statutes bear on the issues in this case. First, K.S.A. 38-2267(a) states that when the State files a motion requesting termination of parental rights, the court must conduct a hearing "within 90 days." This statute has been found to be directory, not mandatory. *In re S.C.*, 65 Kan. App. 2d 128, 147, 561 P.3d 538 (2024). This does not, however, mean "that courts are permitted to ignore CINC statutory requirements." 65 Kan. App. 2d at 148. While the "failure to follow a statutorily required process does not

9

inevitably result in a due process violation," "delay can eviscerate the ability to meaningfully accomplish the purpose of a permanency hearing." *In re A.A.-F.*, 310 Kan. 125, 146-47, 444 P.3d 938 (2019).

Second, K.S.A. 38-2266(b) requires a motion to terminate parental rights to "contain a statement of specific facts which are relied upon to support the request, including dates, times and locations to the extent known." This statute codifies the concept that timely, particularized facts are a key element of notice. Our courts take a balanced approach to determining whether the facts alleged in a motion to terminate parental rights are sufficient. Too many facts, or too few, could result in a due process violation.

*In re C.H.W.*, 26 Kan. App. 2d 413, 988 P.2d 276 (1999), provides an example of a situation where the State alleged too many facts, raising due process concerns. There, the State's motion to terminate parental rights contained only three numbered paragraphs which incorporated documents from the case file, including the petition, journal entries from several hearings, and 48 pages of exhibits from those hearings. The parent objected to the motion on the grounds that it failed to identify, with specificity, those facts that established that termination of their rights was warranted, as required under the statute. 26 Kan. App. 2d at 414-15. The district court agreed and struck the motion. The State appealed and our court upheld the dismissal of the motion. 26 Kan. App. 2d at 419-20. In addressing the due process implications, the court stated:

> "The loss of all parental rights by SRS's actions involves significant private interests. The procedure of incorporating entire reports by reference without making specific allegations in the pleading leaves parents and their attorneys to defend against all allegations in the reports or to choose certain allegations in the reports to defend against. By the latter approach, parents risk losing their children if they choose the wrong allegations to defend. By comparison, the probable value of requiring specific allegations in the motion as a procedural safeguard is strong since it eliminates the guesswork.

10

"Protecting parents from unclear pleadings must be weighed against SRS's interest in protecting children from abusive or neglectful parents. Requiring SRS to specifically allege in its motion the basis for termination will require more time to prepare the motion. SRS wants to shift the additional time to glean the merits from the reports for termination to the parents and their attorneys. This preparation time is an inconsequential inconvenience to SRS, and to shift that burden to the parents is not a fundamentally fair procedure to meet due process requirements." 26 Kan. App. 2d at 419-20.

In contrast, *In re M.G.*, No. 115,007, 2016 WL 4159902 (Kan. App. 2016) (unpublished opinion), provides an example of a due process violation created by the State's failure to allege facts with sufficient particularity, though the court ultimately found the error harmless. In that case, the State's motion to terminate a father's parental rights cited the following facts in support of termination: failure to maintain suitable housing, the amount of time (18 months) the case had been pending, the father's general lack of progress toward improving his circumstances, and, that the father was recently charged with indecent liberties with a minor. The motion listed every statutory reason for finding unfitness and alleged that the father was unfit under "'one or more'" of those reasons. 2016 WL 4159902, at *2. The evidence presented at the termination hearing went beyond the facts alleged in the motion to also include evidence of drug use, his failure to visit the child, and domestic violence concerns. The district court terminated the father's rights after finding that reasonable efforts at reintegration were unsuccessful, the father failed to adjust his circumstances, conduct, or conditions to meet his child's needs, he neglected to maintain consistent visitation, contact, and communication with his child and case workers, and failed to complete his reintegration plan. 2016 WL 4159902, at *6.

Father appealed and argued that the motion to terminate was so deficient that it violated his statutory and procedural due process rights. This court agreed, specifically taking issue with the fact that the motion listed every single statutory basis to substantiate an unfitness finding but neglecting to also include any corresponding factual allegations

concerning the father's drug use or lack of visitation with his child. We explained that due process requires notice to be reasonably calculated so as to give interested parties an opportunity to prepare a defense. 2016 WL 4159902, at *8-9. Because the State "list[ed] every factor in the statute without providing factual support for each factor, the State placed Father in the position of either preparing to defend against all the identified statutory factors or running the risk of choosing the wrong allegations to defend against." 2016 WL 4159902, at *9.

Aspects from both of these authorities are detectable in the present case. Specifically, the extent of the facts the State relied on during the course of the hearing surpassed those outlined in the motion it filed 18 months earlier. The State's motion only alleged facts through July 2022 while the evidence it elicited at the hearing went far beyond that time frame. K.S.A. 38-2266(b) calls for "a statement of specific facts which are relied upon to support the request, including dates, times and locations to the extent known." Mother was expressly not afforded the benefit of a statement of specific facts to defend against.

The district court dismissed Mother's objection on the grounds that even though specific dates and times were not updated since the filing of the motion, the statutory bases for finding unfitness were "still there." The district judge reasoned, "[T]here is no doubt in my mind that [Mother] and all of the parties involved in this case are very aware of what has occurred since that time." This had the effect of incorporating even more evidence than what this court found impermissible in *In re C.H.W.* While it is true Mother is aware of what has transpired over the full breadth of her case, that does not equate with an awareness of precisely what the State intends to rely on to satisfy its burden at the hearing. Due process demands that a person facing the termination of their parental rights be apprised of the specific facts buttressing the State's contention that the children's best interests demand such extreme and irreversible measures.

12

This is not to say that a motion must allege every fact that might conceivably be uttered during the hearing. Due process does not mandate prescience. "It is inevitable in a termination of parental rights case that evidence comes out at the hearing that was not specifically set forth in the petition." *In re Adoption of F.D.A. III*, No. 91,103, 2004 WL 1716247, at *3 (Kan. App. 2004) (unpublished opinion). Rather, the parties must simply have the assurance they are entering the courtroom on equal footing, with an understanding of what will primarily be alleged to establish a parent's unfitness for the foreseeable future.

The final point we must consider under this factor is the probable value, if any, of additional or substitute procedural safeguards. We have no hesitancy in concluding that the probable value of an updated motion from the State is high. Imposing that requirement would have afforded Mother the opportunity to prepare a more focused defense. As this court noted in *In re C.H.W.*, 26 Kan. App. 2d at 419, "the probable value of requiring specific allegations in the motion as a procedural safeguard is strong since it eliminates the guesswork."

In sum, the long delay between the filing of the motion and the termination hearing coupled with the lack of specific recent factual allegations in the motion to terminate, created a considerable and untenable risk of erroneously depriving Mother of her parental rights. This factor also weighs in Mother's favor.

*The State's Interest in the Procedures Used, Including the Fiscal and Administrative Burdens that Any Additional or Substitute Procedures Would Entail*

As we move into the third and final factor of our analysis, we acknowledge there is no doubt that "the government's parens patriae interest in protecting minor children is substantial and of great importance." *In re J.L.*, 20 Kan. App. 2d at 675. "Part of protecting the children means ensuring that the children have some stability in their lives,

which means cases need to be completed in a timely manner." *In re M.S.*, 56 Kan. App. 2d 1247, 1254, 447 P.3d 994 (2019). That is why our statutes provide that child in need of care proceedings must "be disposed of without unnecessary delay" and why appeals in these actions are given "priority over all other cases." K.S.A. 38-2246; K.S.A. 38-2273(d).

The burden of updating the motion to terminate parental rights is minor when considering the significant interests at stake in a termination case. See *In re J.L.*, 20 Kan. App. 2d at 675 ("[T]he grievous loss suffered by a parent from the termination of the parent/child relationship greatly outweighs the government's interest in a summary adjudication."). This is particularly true given the fact that the scheduling delay was directly attributable to the State's repeated requests for a continuance. That is, the State was aware what facts it intended to rely on at the hearing and certainly had a significant amount of time at its disposal in which to prepare an updated motion. As we have said before: "It does not place an unacceptable administrative or fiscal burden on the government to require that it prove unfitness by real, relevant, *and recent facts* to terminate a parent/child relationship." (Emphasis added.) 20 Kan. App. 2d at 675. This factor also weighs in Mother's favor and, as such, Mother has successfully established that she suffered a due process violation.

*Harmless Error*

Procedural due process errors are subject to our constitutional harmless error test. See *In re A.S.*, 319 Kan. at 409-10. Under this test, an error may be deemed harmless "'where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict.'" 319 Kan. at 410. But the State does not address harmless error in its brief.

Consequently, it has failed to carry its burden to show that any error that occurred had no effect on the termination proceedings.

CONCLUSION

Parents have a fundamental right to make decisions regarding the care, custody, and control of their children. When the State seeks to terminate this right, it does so with the best interests of the children in mind, but it must also ensure that a parent's procedural due process rights are respected. Those considerations were not afforded equal weight in this case, and Mother's due process rights were compromised such that the decision of the district court cannot be permitted to stand. Mother's case is reversed and remanded with directions to conduct a new termination hearing, where the playing field is level and both parties are equally apprised of the precise factual allegations that will be litigated to discern whether the best interests of the three children demands this extraordinary remedy. Because our holding is limited to Mother's due process claim, we make no findings with respect to the validity of the district court's termination decision.

Reversed and remanded with directions.